Good morning, your honors. If it pleases the court, my name is Donald Driscoll. I am here on behalf of Lacey Stradford and others who are similarly situated. I would ask for leave to reserve four minutes of my time for rebuttal. Your honors, all who are in prison who have been granted parole with a sex offense classification but who have been unable to identify a home plan while in prison are similarly situated in all relevant respects to other offenders who have been granted parole, who have been unable to identify a home plan while in prison. They are also similar in all relevant respects. This is a putative class action? Yes, your honor. Mr. Driscoll, let me cut to the chase for me anyway and ask you about what to me to be a particularly high hurdle for you. You acknowledge as you must that we are applying as the district court did a rational relationship test and I assume that you agree with me that that is in the ordinary course a high hurdle in terms of plaintiff's need to show a basis for why something doesn't meet the rational relationship requirement. Yes, I do agree. So as an appellate court which is going to apply that standard and faced as we all are with at least language from the Supreme Court of the United States and in this situation by specific example I am referring to Smith v. Bell 2003. This language because it involved an Alaska statute. Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism. The legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class. The risk of recidivism posed by sex offenders is, quote, frightening and high. That's the language that the Supreme Court of the United States employed. So my question for you is how would we write an opinion faced with this language and the rational relationship test low hurdle for justification of the policy by the state and write an opinion finding that this was not rational. How do we write an opinion? Your Honor, I'd like to respond in two ways. Number one, that particular case had to do with all sex offenders. It was a registration case. We're not talking about all sex offenders. I understand that and that's why I said this is language. Yes. But it is language that provides a backdrop. So when the highest court in the land has said this and it's a backdrop to other governmental decision making, I mean the commonwealth isn't rational here. They're not being reasonable. Well, in the context that we are faced with here, we are not talking about all sex offenders, all convicted sex offenders. We are talking about those who have undergone an individualized assessment and where it has been determined that there is no reasonable indication of risk of public harm to the public safety. That is a requirement before parole can be granted as determined by the Pennsylvania Supreme Court interpreting the paroling statute. However, in addition, I do not believe that the minimal scrutiny standard is uniform. Yes, there are legions of decisions that have determined that it is a very low bar. This court, though, in Doe v. Board of Probation and Parole, following the Supreme Court's decision in Romer v. Evans, determined that even in the ordinary equal protection case, a court insists on knowing the relationship between the classification and the objective to pursue. You're not disputing the fact that the rational basis test applies. No, it certainly does apply, but the origin of the U.S. Supreme Court case that has developed this very deferential standard right from the outset, the United States v. Caroline Products, it's a 1938 U.S. Supreme Court case, and multiple cases since then, the Village of Wellington Heights indirectly referenced Caroline Products. Vance v. Bradley, Beach v. Communications, and opinions of this court have recognized that there is a difference when there is reason to infer antipathy, when there is reason to believe that the normal political process will not be sufficient to correct an improvident decision. In this particular case, as I understand the Commonwealth's bulletin, it wasn't just sex offenders. There were other high-risk offenders that were subject to these restrictions. I'm not sure that it's really high-risk offenders. I think that there are other offenders that have been the subject of fear in the community, unfounded fear in the community. You would agree that they're not just sex offenders? There are a couple of other classifications. I'm not here on behalf of those. I don't know the particulars of how that plays out with those. I am very familiar with sex offenders. I understand, but the state or the Bureau of Prisons is arguing or advancing the argument that communities don't want these folks in their neighborhoods, so to speak. If we were to release them on their parole date or afford them access to the halfway house on the parole date, it would clog the system and it would prevent us from placing folks that are more suitable to place them in the halfway houses. How is that not a rational... How does that not satisfy the community? I wouldn't satisfy it for two reasons. One, because it's arbitrary. It's substantially overbroad. It applies without regard to the individualized assessment. It applies without regard to the offense that a person is in prison for. They may not be serving time for a sex offense. It applies without regard to community notification. It applies without regard even to registration. It applies without regard to the fact that these individuals have completed all institutional programs. They have been recommended for parole by institutional staff, DOC institutional staff. They have been determined to be motivated to succeed. Yes, when you have an across-the-board community sentiment that is unfounded and that leads to this policy, that is not a legitimate or constitutional offense. What do we do with the Department of Corrections? You said it's unfounded, but it's actually... There are two problems. One, you've got the fear that you're saying is unfounded is incorporated into the state findings. Somebody made findings based upon that quote, unfounded fear. Whether it's founded or not were legislative findings, but those findings are inconsistent with the Department of Corrections hard data on recidivism rates. How do we deal with that? Your Honor, the legislative findings, again, applied to a different statute altogether. It was the Megan's Law of Registration Statute, and that is a different category of individuals. These folks are included within this group. They are included, but there are many who are not subject to community notification or even registration. But the important thing... As a parenthetical, given the acknowledgement you've just made, and it does not affect the question before this panel, does your concession suggest that because this is a punitive class action, you're looking at the need for some subclassing going forward if you were to seek certification? No, I don't believe so. Just acknowledge the difference between sexual offenders generally and this subset of child sexual offenders. The difference is that all in the class have been determined or been granted parole. They've earned parole. They've completed institutional programming. They have been recommended by institutional staff. They've been found to be motivated to succeed. This is different than all with sex offense classification, and yet this policy applies to all with the sex offense classification. But what particularly renders this policy arbitrary is that there is a very same impact. There's no interest or concern on the part of the department that is any different at the two-year before maximum term than it is at the parole term. Where do the two years come from? One out of three years, or six months, or two days? Where do the two years come from? I think that we are here based on a grant of a motion to dismiss. Under normal circumstances, and I believe under the circumstances applicable in this case, given the acknowledgement of animosity and fear toward this group, we are entitled to a favorable inference. I believe consistent with what the department has stated, that their policy is based on limiting access of these individuals into the community until two years before the maximum term. But why two years? That speaks to the arbitrariness of this. I don't know why two years. Yes, it could be six months, it could be three years. The relevant consideration, though, is when they are granted parole. It serves no purpose for them to languish in prison. They've completed institutional programs. They are losing more access to the community. They should have opportunity, like other offenders, to succeed as the Pennsylvania Police Statute authorizes and is there for, to complete successful community reintegration. Do you know any median sentences for people in this group? Is that anywhere? No, I do not know that. There's relatively minor sexual offenses and others, but the important thing, though, is that there's no relationship between the two years and the paroling date. Pennsylvania statute looks to access to community integration at the paroling date, not some arbitrary two years before they reach a maximum term. That's inconsistent with the agency that is authorized to make that determination. It's also inconsistent with the sentencing courts that set maximum and minimum terms. That is when you are eligible for parole, and that is what these individuals have. That's the judge's expectation. I'm sure if you took a survey of state judges in Pennsylvania, they had no idea that when they imposed the minimum and the maximum, the minimum is not the date that the person would be likely to be released. And, unfortunately, that is also the belief of most who have a sex offense, who believe that when they plead guilty to their offense and accept responsibility for that and work toward earning their way back into the community, they also do not believe or are not aware of the fact that they're not practically eligible for parole until they reach this arbitrary two-year term. Is there anything in the 2013 recidivism report that supports your position? Was it recidivism rates? Yes, Your Honor. We did attach to the appellant's brief the Department of Corrections' recidivism rates, and it does demonstrate that sex offenders have one of the lowest rates of recidivism. Does it break out the rate of recidivist behavior that is the same as the original behavior? Yes, that is exactly what it does. I believe it does, Your Honor. I'm afraid that it's been a while since I've looked at it. I think maybe when you come back and rebuttal, you can point us to that portion of the report that is attached to it. I think your reply brief? Yes. Thank you. You've reserved four minutes for rebuttal, so we thank you. We'll have you back. Thank you, Your Honor. We'll hear from Ms. Rand. Good morning, Your Honors. Thank you on behalf of the Secretary for allowing us to appear. Ms. Rand, could you begin just by describing the policy itself? I realize this is factual, and we don't often get into factual matters, but describe the policy itself and then how the policy works on the ground. Of course, Your Honor. The policy is attached to the appellee's brief so that the court can look at it. Essentially what we're concerned with here, what the policy is addressing, is a group of inmates that we call HTP, hard to place. Within that group are four subcategories, and these are defined right in the policy itself. There's a section, and it's on page 4-6 of the policy. The four categories are sex offenders, arsonists, people who have significant mental health disabilities, and people who have significant physical health disabilities. And what the department has determined through its experience is that these four groups are individuals who have difficulty finding a place to live when they are released from prison. Understand that any inmate, including people who are sex offenders, if they find a place to live while they're still in prison, once they're paroled, if they find a place to live before they get out, this policy doesn't even apply. In addition, if you look at the first page of the policy, you will notice that there are three groups of sex offenders, or actually one group of sex offenders that doesn't even fall in this policy at all. For individuals who have been committed of a sexual offense, but based on certain testing, including the static 99 and a couple of other tests that are used that help determine recidivism, if the inmate registers a low possibility of recidivism on all three of those tests, they aren't considered hard to place at all. So they're not subject to this two-year rule or two-year limit. So it's not everyone. It's those who, based on the testing, seem to have a greater likelihood. And it's those who, in addition, haven't found a place to live outside a community correction center. Where did the two years come from? And why isn't the two-year number in and of itself? I think part of what the answer is, the two years is in the policy. If you're going to ask me why two years is the magic number, I don't have an answer. But what I can tell you is the real magic number. The real magic number is six months. This is the identity difference. What has been said about six months from the date of the vaccine? Yes, and that's what I want to make sure the court understands. In Pennsylvania, an inmate can be paroled once they have served the minimum sentence. And if the board determines that they're appropriately paroled, they get a paroling order. And the paroling order, in many instances, is going to say, parole to an approved home plan or to a community correction center. If you get paroled to a community correction center, the idea is while you're there, you'll look for a place to live. It's certainly easier to find a place to live when you're in a community correction center. The language of that order turns in whether or not the inmate has been able to find a place before the order is issued. Then this policy doesn't stop them. They can go. So that order, the language in the order, only applies to those folks who have been able to find- who couldn't find a home plan while still in prison. Correct. Aren't the folks in this class, this group, aren't they folks that have been paroled by your system with all the protocols that the secretary has in place to see that somebody determined the good parole risks, right? Correct. So let me explain a little bit about the mechanics here. The person gets a paroling order. And what the paroling order is going to say- It's an order from the parole board that says parole is granted. Now, understand that the minute that order is in their hands, it doesn't mean they get to walk right out of the jail. What it means for those who don't have a home plan, let's be clear, we're only going to talk now about those who don't have a home plan. Does the order say parole to a halfway house? It will say parole, yes, to a community correction center or halfway house if you want. Now, here's where the problem comes in. There are a limited number of halfway houses. There are fewer beds in halfway houses than there are people being paroled generally. I'm talking about all kinds of inmates getting paroled that don't have a home plan, not just sex offenders. So what happens is the department has discovered that these four groups that I named at the beginning are people who when they go into a community correction center have difficulty finding a home. Because they're sex offenders, they're arsonists, they have very serious mental health issues or very serious physical health issues. And usually when we're talking about physical health, we're actually talking about things like Alzheimer's. We're not talking about diabetes or something like that. How would it be any easier for these sex offenders to find a place to live two years closer to the maximum date than on a parole date? I don't think that it is, but let me finish. There's no difference? Okay, let me explain. That makes sense. At least than even earlier. I can say it again more times than that. Except, here's what I think it's important for the court to understand. There are a limited number of community correction centers. Therefore, there are a limited number of beds. These hard-to-place offenders are individuals who when you put them in this setting, for the most part, are either not able to find a home plan at all, or it takes them longer than average. I think we all understand that the problem I'm having, and I wouldn't be surprised if the problem is shared by my colleagues, is that let's assume that X is the number of people in this hard-to-place group that are in this class. X doesn't change automatically, magically, two years from the maximum date. X doesn't, deferring that population that is X until two years, doesn't alter the fact that you're concerned about clogging up the system, which makes some sense. Clogging up the community correction centers so there are no beds and not enough spaces. The number of spaces is not affected by the number X. It's the same number are being leased. They're just being deferred until two years from the maximum, which might be a substantial increase over the sentence. Take somebody who has a sentence of two to ten years. At least in Philadelphia, that kind of a sentence is not uncommon. That person, and let's assume they're poor and they fit within this class, the sentence in judge assumes that the sentence of two to ten years means this guy is getting eligible to get out at two years. What the policy says is that this guy is only getting out at eight years, four times the minimum that the sentencing judge intended, and I don't understand the magic of the two years. Right, if they can't find a home plan. Understand, though, when we're talking about this bed limit, what I'd like you to imagine is for a moment that you have a community correction center that has 40 beds, okay? And let's just suppose we parole a large number of the hard-to-place inmates into that community correction center close in time. At what point? Whenever they get a paroling order. It would have to be at their minimum or later. Let's just say they're getting it. Let's use the worst facts for me. They're going to parole them at their min, and they're all serving five to ten. Let's just make it reasonable. Okay, let's use my facts. They're all going to be paroled two years from their maximum. Okay. What will occur is if you have those individuals, while they are in that bed, nobody else can use it. On average, the turnaround time for a bed is 90 to 120 days. With these people, the turnaround time may be two or three years. But that doesn't change the math. But what it does is it doesn't allow us to parole other individuals who are not hard-to-place but don't have a home plan. Yes, it doesn't change the fixed number of beds, right? No. What it does is it keeps other people who have been paroled who would be able to go in and get out of the CCC more quickly. It keeps them from getting out at all. So what's happening is the overall number in the – That's why I asked you to use the two-year date as the magic date. The same thing happens two years from the minimum. You're not reducing the number of people. You're just changing the time that they're eligible to try to get into the – that they're able to get into the Community Correctional Center. They can get into it two years from the minimum – as opposed to when they're paroled. That's only true for the hard-to-place ones. That's what I'm talking about. That's what I'm talking about. Right. What I'm saying is what about all the people who aren't hard-to-place but need to go to a CCC to find a home plan? And they're not hard-to-place, so they're going to get out. But you're still – If there's no bed for them because these others haven't moved out, then the whole system is getting backed up. But that doesn't change the math. I mean, the problem I'm having is if you release them two years short of their max or at their minimum, at some point they're going to hit the halfway houses. Yeah, X is the same. And X is the same. And generally, the department tries. I don't mean to do that. X is the same. Whether it's two years before their maximum or at the time they make parole, at that time at the minimum, the number is going to remain constant. You're not reducing the number of people. You're not reducing the number. I would agree. But what you are reducing is the specific individuals. In other words, the rest of them are continuing to move through the system. There's always going to be some backlog in the system. Do you ever remember Professor Odenkori, by any chance? Because this reminds me of Professor Odenkori's dialogue. The comedian? It doesn't make any sense to me. The comedian? Is that who you're talking about? No. There's a comedian with that name, too. The comedian, yeah. Oh, okay. It sounds like that because the number is the same. You've only heard about him. He's old enough to have had a seat. I should have met him. I should have met him. That's the justification for this policy. You're losing me with the math. Okay. The justification for the policy is that we need to keep people moving through the CCCs as quickly as possible so we can keep all paroled people moving through the system. If we put people in who don't get out, there's no space to move new people into that period. But eventually you are putting those people that don't move out in there. We are doing it, and we're committed to doing it within the last six months of their max date in the worst case scenario. We're doing that to try to give them every opportunity we can. The reality is, unfortunately, these are the people who max out with no home plan. That's the hard reality. They're not people who can find a home plan. And when you're dealing specifically with the sex offender subcategory, part of that is the parole board's restrictions on where they can live is another layer. Shouldn't this case at least have been allowed to go to summary judgment so some discovery could be taken to corroborate these suggestions? I thought about that, Your Honor, and I anticipated that question. And I think really my answer is I'm not sure that the facts statistically are in dispute. I don't doubt that the plaintiffs could find some individuals. We don't know. There are no facts that have been developed, so how do we know if the facts are in dispute? Well, I think what's not in dispute, and Mr. Driscoll will certainly correct me if that's wrong, but I didn't believe that it was in dispute that, in general, those four categories of people, including sex offenders, are people who have great difficulty finding a home plan, generally speaking, unless there are exceptions. My question is what impedance does that make? That's why I'm knocking my head in the wall. What impedance does that make? What happens then to the folks just in the class, forget about the arsonists, who the gate parole, let's say it's a guy with two to ten years. He gets paroled, he's paroled by the parole board at the end of two years. Surprise, though, you can't leave yet. You've got six more years to do because you're in this category. He then serves his six additional years. Now eight years are up, six years past the time the parole board said, you now can go, but you're safe to leave. And now he can fall into this magical class where the numbers start to change. But he finds he still can't get into a facility. At that point, does the person just max out? And if they do just max out, what happens? They're released into the street with no need for parole. Yes, sir. That would be true of anyone, not just one of the people in this category, assuming someone were not hard to place and they were paroled to a CCC and they didn't find a home plan for however long until their max date. They would absolutely max out and they would be essentially in charge. How many people in this class who actually max out with no supervision, no treatment? I do not know the number. I do not know the statistics. Wouldn't that be helpful to know? Because if, hypothetically, because of this two-year magic, the number of people who max out is substantial, hardly different than it was substantial, meaning that this policy is now putting people who probably should receive some kind of therapy and supervision, they're denied the opportunity they get in the halfway house, putting them right out into the street. And at that point, there's no control to the parole board as to where they go. That's the policy that we have. That's the end result of that policy. And I know that that basis test is an easy one to satisfy, but I'm looking for the logic in that process. And I think seeing this image in the mind of Roland Corey is a search for the logic. One thing you may want to understand is that for anybody who is paroled to a community correction center and who has some type of programming need, whether it's to attend sex offender therapy or go for mental health treatment or whatever, understand we can only provide the treatment if it exists. There are places where it doesn't exist, and it doesn't exist because although the department has put out a bid opportunity to provide, say, therapy, no one's bid. I think you started our discussion by acknowledging it's easier to find a home plan when you're in a halfway house. I think that's true. I would agree with you. The current policy makes it more difficult for these sex offenders to find a home plan if you're delaying access to the halfway house. So isn't it counterproductive then at the end of the day? Because consistent with Judge McKee's question, you're releasing people then with nothing because you're giving them less time to find a home plan. Yes, that's certainly true. What part of that is true? So it is counterproductive? I would agree you're giving them less time for a home plan. Which is counterproductive. It may be counterproductive to those individuals. It's counterproductive to all of us. If you're talking in terms of helping folks finding homes and reducing recidivism, if you're making it more difficult for these folks to find housing. I think my response would be it's also counterproductive if there's somebody who doesn't even get to go to a CCC because there's no space, so they max out in prison although they were more likely to find a home plan because they weren't hard to place there. But you're having the availability of the limited space of beds, which we all understand and I'm sure we're all sympathetic with. But then we get back to X. The limited space in beds somehow doesn't get fixed because people have to wait until two years of their maximum. The beds you have don't increase. They're not magic beds. These are Hogwarts beds. These are real beds. The number doesn't change. Two years from the maximum, the number is the same as it would have been when the minimum was up. Again, I guess my response is I don't disagree with that statement. What I would say is by limiting the number that we have at a given time, it allows for other beds to be free so that other inmates can move through the system. Why? That number would remain the same because nobody's sleeping there. It's not amazing. Thank you, Miss. Mr. Driscoll, you have rebuttal. Putting aside that X is indeed the same, facts are in dispute here. We have alleged facts, and I believe that we are entitled to an inference at this motion to dismiss stage that the highly deferential standard is inapplicable in this case because of the acknowledged animosity and unfounded fear that this court should and the district court should exercise what Romer v. Evans Court, what Dover v. Board of Probation Parole Court did was to know the relationship. The facts that are in dispute, and I believe that we will readily be able to prove this, that many if not most of those who are unable to identify a home plan while in prison is because of economics. Yes, they can't contact landlords. They can't search out available apartments. If they do, they're months away from actually accessing those apartments. But they've gone through prison. Many have skills, employment skills to begin with. Many others acquire those skills. Is it subclasses that were indigent sex offenders we're talking about now? No, no, no. Well, they are part of the mix. You said it was based on economics, is what you just said. Right, right. No, I would venture to say that if there is a paroled sex offender who has not identified a home plan, in the vast majority of instances it is because of economics. They do not have the money to secure a home for 46 and sometimes more months during the approval process, during the CCC process. They don't have the funds to do that. They have employment skills. They've developed those skills in some instances. Many of these individuals are eligible for Social Security, Veterans Benefits. None of this is available until they're actually released. They cannot earn any income. That's part of the reason for the CCC, to assist the individual, identify employment, begin to receive Social Security or Veterans Benefits so they can pay for a home plan. They don't have that ability while they're in prison. I believe, Your Honor, that we will be able to prove that this great likelihood of inability to find a home plan and maxing out, that that is not accurate and that we should be entitled to discovery to demonstrate that. Thank you, Your Honor. Thank you. Let's get our mics here. The panel would ask if counsel for both sides would approach the bench so that we might have a few words with you. I'm sorry. Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.